Frank A. Gulotta, J.
This is a motion for a temporary injunction brought by the plaintiff to restrain the defendant during the pendency of the action from paying out race purses for overnight harness races in excess of an established schedule.
The complaint alleges that for the 1958 racing season, the schedule was as follows:
Free For All races..........................$10,000.
Junior Free For All races................... 6,000.
Class 1* AA ’ ’ races......................... 4,500.
Class “ A ” races........................... 3,500.
Class “ B ” races........................... 2,500.
Class “ C ” races........................... 2,000.
and that it was thereafter continued for 1959 season commencing March 20, 1959, as follows:
Junior Free For All races................... $6,000.
Class “AA” races......................... 4,500.
Class “A” races........................... 3,500.
Class “ B ” races........................... 2,500.
Class “ C ” races........................... 2,000.
The omission of the first class, ‘ ‘ Free For All races ’ ’, is not explained. In any event, on June 1, 1959, the defendant without prior consultation with the plaintiff unilaterally established a new schedule as follows :
Free For All races..........................$25,000.
Junior Free For All races................... 10,000.
Class ‘ ‘ AA ’ ’ races.......................... 6,000.
Class “ A ” races........................... 4,000.
Class “B” races........................... 2,500.
Class “ C ” races........................... 2,000.
Who “established” and who “continued” i.e., the actual mechanics of establishing and continuing is not disclosed.
In addition to opposing the motion for a temporary injunction the defendant has cross-moved to dismiss the complaint under rule 106 of the Buies of Civil Practice, as insufficient in law.
The plaintiff is a membership corporation composed of owners, trainers and drivers of harness racing horses, and its function and purpose is the protection and furthering of the interests of *663 its members, and the sport of harness racing in general. The defendant is the owner and operator of a harness racetrack at Yonkers, New York. The plaintiff’s right to interfere with, and inject itself into the problem of determining purse schedules, is based on a contract entered into on April 16, 1958, between the plaintiff and the defendant for a term of 10 years.
One looks in vain in this detailed 12-page printed instrument for any provision which specifically deals with the question as to how purse schedules are to be established.
Races are broadly divided into two categories (1) special features and (2) overnight events, the latter category encompassing the aforesaid purse schedules which are in dispute here. The agreement provides that, of the defendant’s “take” or share of the amounts wagered in the pari-mutuel betting machines, 34% shall be devoted to total purses, with an additional override of 44% of the racetrack’s share of wagering in excess of $9,900,000 per week. The gross purse is then divided 15% to “ Special Features ” and the remaining 85% to “ Overnight Events ’ ’.
Paragraph Second of the agreement announces an avowed purpose to avoid fluctuations in the amounts available for weekly purse distributions, by projecting purse offerings based on the total purse distribution for the previous year, with a provision for review of purse schedules and reduction or increases thereof, should the pari-mutuel wagering in the current year make that necessary or desirable. Subdivision (e), after binding the racetrack to pay not less than 75% of the total purses distributed in the previous year in equal weekly amounts, contains this significant provision: ‘1 The Racetrack, at its option, may raise overnight purse offerings at any time.” This would appear to confer upon the defendant a clear authority to do what it has done here. The plaintiff’s argument, that this only gave the defendant the right to allocate more than 34% of its “ take ” to the gross purse pool, is neither persuasive nor reasonable, since defendant needed no contract authority to make a voluntary donation of its own funds. It is much more reasonable to suppose that this referred to surplus funds, which would tend to accrue as a result of the 10% cushion, which was left between the 75% minimum which was allocated to purses, and the 85% of the current wagering which was being set aside each week. However, this contract is sufficiently ambiguous in several important respects, as to preclude granting ¡the cross motion to dismiss the complaint as a matter of law. The parties by their conduct apparently have placed some practical construction on it, to meet these uncertainties and a *664 trial is required to resolve them. However, the plaintiff's case falls far short of being established clearly enough, to warrant a temporary injunction.
In considering the equities of the situation and the harm that could result to the several parties by the granting or withholding of this relief, the following salient points stand forth:
It is obvious that these large purses have a public appeal and a promotional value, the increased revenue from which would be irrevocably lost to the defendant, if an injunction were to issue now to enforce the plaintiff’s somewhat dubious rights. On the other hand, the depletion of the surplus fund which will result from adherence to the higher schedule, will be known to the penny at the end of the race meeting. If the defendant is willing to assume the financial risk of eventually being defeated in this lawsuit, there is no reason for the court to intervene and stop it from doing so, especially in contrariety to its wishes. Certainly its voluntary payment of increased purses in the meantime, will not prevent a court in the future from directing it to reimburse the surplus fund which is to be divided among all the ‘ ‘ First to Fifth finishers ’ ’ at the end of the racing season in accordance with the schedule set up in subdivision (d) of the paragraph Second, should the court decide that a vested right of the persons for whose benefit this contract was made, has been invaded by the defendant. The relatively large amounts involved (the so-called surplus fund which on May 31, 1959, amounted to $337,543.63 had been depleted by $117,949.09 at the time of the complaint) furnish no reason for the court’s intervention in the drastic manner proposed, since there has been no proof or intimation, that the defendant is not well able to make good any deficit for which it may be called to account.
Both the motion and the cross motion are accordingly denied.
Short-form order signed.